Filed 2/24/14  R.I. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| R.I.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MONTEREY COUNTY,<br><br>     Petitioner,<br><br>MONTEREY COUNTY DEPARTMENT OF SOCIAL AND EMPLOYMENT SERVICES,<br><br>     Real Party in Interest. | H040486<br>(Monterey County<br>Super. Ct. No. J46732) |

## I.     INTRODUCTION

R.I. is the father of M.I., the child at issue in this juvenile dependency case.  The father has filed a petition for extraordinary writ seeking review of the juvenile court's orders terminating his reunification services and setting a Welfare and Institutions Code section 366.26[1] permanency planning hearing.  The father contends further reunification

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

services were in the child's best interest and that there was a substantial probability the child would be returned to him by the 18-month review.

For the reasons stated below, we find that the juvenile court's findings and orders are supported by substantial evidence, and we will therefore deny the writ petition.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Section 300 Petition*

On September 18, 2012, the Monterey County Department of Social and Employment Services (the Department) filed a petition under section 300, subdivision (b) [failure to protect] alleging that M.I., who had been born one month earlier, came within the jurisdiction of the juvenile court.  The petition alleged that the parents were unable to provide regular care for the child due to their substance abuse and domestic violence.

The mother had one other child with the father:  G.I., who was born in 2010.  The mother also had two other children from a different father.  At the time the petition was filed, all three of those children were living with the maternal grandmother in a legal guardianship.  There was a prior referral concerning G.I., who had tested positive for opiates and methadone at the time of her birth and had undergone severe withdrawals.  At that time, the mother had also tested positive for drugs, and the father had admitted using prescription medications.  The mother and father had agreed to participate in family reunification services.  During the reunification period the father had tested positive for amphetamines, and he had been manipulative, hostile, and aggressive with the social worker.  There had also been reports of domestic violence in the home during the reunification period.

The petition further alleged that when M.I. was born, both the mother and M.I. had tested positive for drugs.  Hospital staff had smelled alcohol on the father's breath.  M.I. had withdrawal symptoms and had to be placed on morphine and remained in the hospital.  The mother had admitted she used methadone pills, claiming she suffered from

chronic pain and had prescription medication. Father likewise claimed he used only prescription medication, although he had tested positive for opiates and amphetamines. He claimed he did not know when the mother was using drugs.

Maternal relatives had reported that the father was abusive towards the mother. They reported that he prohibited her from eating for days and that he had caused her to suffer a black eye. The mother denied any domestic violence in the home.

A team decision making meeting was held at the hospital on September 5, 2012, addressing the issues of domestic violence and drug use. The parents participated in the meeting, although the father threatened legal action towards the hospital and the Department during the meeting. The father claimed he did not need any help caring for M.I. and claimed to have eight other children, none of whom were in his care. The parents agreed to visit M.I. on a daily basis, to cooperate with hospital staff, and to undergo drug testing. The mother agreed to make daily calls to get into a residential treatment program and to attend NA/AA meetings. The father agreed to sign up for Dads in Action and domestic violence classes.

A second team decision making meeting was held on September 13, 2012. Father had tested positive for amphetamines but claimed the positive test was the result of him drinking a Red Bull energy drink. The parents had been inconsistent in visiting M.I. Father had not attended any domestic violence classes. The mother had not made daily calls for openings in a drug rehabilitation program. M.I. remained in the hospital and was being weaned off of morphine.

### B. Detention Hearing

At the detention hearing held on September 19, 2012, the juvenile court found that continuance in the parental home would be contrary to the child's welfare and that removal from the parents' custody was necessary to protect the child's physical or emotional health. The court therefore determined that a prima facie showing had been made that the child came within section 300, and it ordered the child detained.

3

## C.    *Jurisdiction/Disposition Report and Case Plan*

The Department filed a jurisdiction/disposition report on October 19, 2012.  The mother had been interviewed on October 11, 2012 and had admitted using drugs three days earlier.  The father had denied using any illegal substances but was reluctant to discuss his use of prescription medications.  He had provided inconsistent information to the social worker.  "For example, he stated that he attended a domestic violence class, during a time where he claims he was at the hospital visiting the child."

The report noted that there may have been a recent incident of domestic violence. On the day of the detention hearing, the mother had not appeared in court.  According to the father, the mother had gone to the hospital after hitting her head during a seizure.  The social worker had observed "a large and suspicious bruise" under the mother's chin, but the mother had corroborated the father's story.

M.I. had been released from the hospital to a concurrent foster home.  The Department had considered placing M.I. with her maternal grandmother.  However, an assessment of the maternal grandmother's home revealed numerous other children present, including an infant strapped into a carseat inside a playpen.  The home was dirty and there were cockroaches on the walls.  The maternal grandmother had not been participating in any of the recommended services for G.I., who remained in her care.

The mother and father had been provided with visitation two times a week and had been consistent in visiting M.I.  The father had several conflicts with the caregiver and believed that a piece of lint found on the child was actually mouse feces.  The father would spend the first half of the visits examining the child, writing notes, and "making disparaging comments about the caregiver in a cooing child-like voice to the child."  The mother appeared to be very tired during several visits and would close her eyes for extended periods of time.

4

The Department reported that the mother and father had participated regularly in the case plan, but that both had made only minimal progress toward alleviating or mitigating the issues necessitating the child's placement in foster care.

The case plan was filed on October 22, 2012. The mother's service objectives included developing and demonstrating the ability to remain clean and sober. The mother's responsibilities included successful completion of a residential treatment program, attendance at NA/AA meetings at least three times per week; completion of parent education classes, the Parents as Teachers program, and the Parent Education Group; regular attendance at counseling; and consistent participation in visitation.

The father's service objectives included developing and demonstrating the ability to maintain a non-violent relationship and the ability to avoid abusive or threatening interactions. The father's responsibilities included completion of parent education classes, the Parents as Teachers program, and the Parent Education Group; regular attendance at a domestic violence program; regular attendance at counseling; and consistent participation in visitation.

### D. *Jurisdiction/Disposition Hearing*

An uncontested hearing on jurisdiction and disposition was held on October 24, 2012. The father informed the court that he had already begun attending parenting classes and domestic violence classes and that he had signed up for the Parenting as Teachers program. The mother informed the court that she had completed 41 group sessions at an outpatient drug program. The juvenile court acknowledged that the parents were "making efforts" but instructed them that they had "a huge amount of work" to do before they would reunify with the child.

The father responded to the court's comments by asking that "an investigation be done regarding the social worker." The father asserted that the social worker had forced the mother to accuse the father of domestic violence. He further asserted that all of the domestic violence allegations were untrue and that the mother was the "aggressive one."

5

The court responded by encouraging the parents to "focus on the issues" that led to the child's removal.

The juvenile court then adopted the findings and orders contained in the Department's jurisdiction/disposition report: It declared the child a dependent of the court and ordered her out-of-home placement to continue, and it ordered that reunification services be provided.

### E.    *Psychological Evaluation of the Father*

On November 29, 2012, Dr. William Alvarez performed a psychological evaluation for the father. Dr. Alvarez described the father as "very defensive and somewhat narcissistic." He identified the father's "poor control over anger" and his "reported chronic pain and use of major pain medication" as risk factors. He noted that the father might benefit from therapy, substance abuse counseling and anger management, but he noted that the father was likely to resist therapy. According to Dr. Alvarez, the father needed motivation to change and to commit to long-term therapy.

When asked about the present case, the father voiced concerns about the Department. He complained that the child was dirty and bruised when she came to the visits. He did not believe that the Department had a plan for returning the child to him, but he claimed to have "his 'own plan,' " which included attendance at parenting classes and a domestic violence class. He continued to maintain that he had not perpetrated any domestic violence but acknowledged that he had "learned some useful things" from the domestic violence class.

The father stated that he was unaware of the mother's drug problem until the birth of G.I. He also believed she had overcome her drug problem after that. He was still in a relationship with the mother at the time of the interview.

### F.    *Three-Month Status Review*

A three-month status review hearing was held on January 23, 2013. The social worker gave an oral report. She first reported that the mother had made "no progress" on

her case plan. The social worker stated that the mother minimized her substance abuse issues, continued to use methadone, had not entered inpatient treatment, had not signed up for outpatient treatment, and had not provided medical records.

The social worker then addressed the father's progress. She described him as being "hostile and aggressive" toward Department staff and not open to feedback or direction. The father, too, minimized his behavior, and he blamed others for any problems. He began his visits with a "full-body inspection" of the child and alleged that the child was being neglected and abused. He dominated the visits, which gave the mother little time to interact with the child. He admitted using five different prescription drugs but failed to provide medical records. However, he had provided certificates from a parenting program and a domestic violence program.

The juvenile court noted that the information indicated that the parents were engaged in "just more of the same" behavior and that they were headed down the "same path" toward the loss of their parental rights.

### G.     Six-Month Status Review

The Department filed a status review report on April 18, 2013 in which it recommended that the court continue family reunification services for both of the parents.

The mother had been addressing her methadone dependence with a doctor. She had been trying to enter a drug treatment program, but her undocumented status made her unqualified for the program she had been hoping to get into. The Department was trying to help her find another program. The mother had not provided any proof of attendance at a 12-step program. However, she had taken parenting classes, was taking anxiety medication, and had demonstrated attentiveness to the child's needs during visits.

The father continued to take five prescription medications for his back pain. He had taken parenting classes and had a certificate from a domestic violence class. He was loving and attentive with the child during visits. However, during the visits the father would control the mother and dominate the visitation time with the child.

7

At a hearing on April 24, 2013, the juvenile court remarked that the parents still had "a very long way to go." It adopted the findings and orders in the Department's report: It ordered the child to remain a dependent of the court in her placement and continued family reunification services.

### H.     12-Month Status Review Report

The Department filed a 12-month status review report on September 24, 2013. The Department recommended that the juvenile court terminate family reunification services and set a section 366.26 permanency planning hearing.

The mother had entered an inpatient drug treatment program on May 15, 2013 but had been discharged from the program on July 11, 2013, when she tested positive for drugs. She had purchased drugs while accompanying another resident to an off-site appointment. After her discharge from the inpatient program, the mother had not sought any other treatment and had not participated in any AA/NA meetings. She had also tested positive for methadone on August 30, 2013.

The mother had participated in a parenting education group until July 18, 2013, when she was hospitalized with pneumonia. While participating in the group, the mother had not been open and honest about her circumstances.

The father had likewise participated in the parenting education group, but he too had not been forthcoming. His participation in the Parents as Teachers program had ended because he had been uncooperative. He had, however, completed three other parenting programs as well as a 12-week domestic violence program.

Despite his claims of having developed insight into the negative impacts of domestic violence, the father continued to be emotionally abusive to the mother. The Department had begun arranging separate visits for the mother and the father because of the father's domination during the visits. The child was not always receptive to interacting with the father during his separate visits, and he would become frustrated. The Department then terminated the separate visits and reinstated conjoined visits. Some

of the conjoined visits had gone well, but during others the father would ignore the mother and criticize her when speaking to the child.

The social worker provided a prognosis in the report. The mother was a substantial risk for returning the child home because of her substance abuse relapses. It was unlikely she would be able to reunify with the child. The same was true as to the father, who continued to stay with the mother despite her relapses, in opposition to the lessons he had been learning. Further, the observed interactions between the parents indicated that domestic violence would remain an issue. After a year of reunification services the social worker had observed the "same behaviors" by both parents. Because the parents had been offered numerous services but were "unable to change the harmful behaviors that impact their children the most," the Department recommended termination of reunification services.

On September 30, 2013, the Department filed an update and progress report. The report reflected that the father had participated in therapy, but he had not been honest and forthcoming with the therapist. He was "obsessed" with the mother and tended to focus on her needs. The father did not take responsibility for the child's removal. He had missed three recent appointments with the therapist.

### I.    *Trial Briefs*

Prior to the 12-month review hearing, the Department filed a trial brief. The Department noted that since the filing of its last report, the parents had not attended two scheduled visits with the child, and they had not called to cancel or reschedule. The Department argued that the child should not be returned to the parents because they had not fully participated in services nor made the necessary progress to justify either return of the child or an extension of services. Specifically, the mother had not "engaged in any sort of meaningful participation to address her substance abuse problem." The father did not appear to understand the mother's substance abuse issue, he had "developed no

9

insight into his issues," and he continued to "display inappropriate behavior towards the mother and Department staff."

In his trial brief, the father argued for return of the child. He noted that he had successfully completed several parenting classes as well as 12 weeks in a domestic violence program. He had "learned a lot and benefit[t]ed from therapy." He had regularly visited the child with the exception of two missed visits.

In her trial brief, the mother requested an extension of services. She admitted having been discharged from her drug rehabilitation program and that she had not been participating in the services that she had been accessing through the program. She remained on a waiting list for a counseling program. She was participating in the Parents as Teachers program and had been applying the parenting skills she was learning. During visitations with the child, she was attentive to the child's needs and had developed a closer bond with the child. The mother complained that her individual visits with the child had been terminated.

### J.    12-Month Review Hearing

The contested 12-month review hearing was held on December 17, 2013. The father, mother, and social worker all testified.

The father listed the parenting classes he had completed and described what he had learned. He did the same for the domestic violence classes. He denied hitting the mother in April of 2013. He claimed the domestic violence program had helped his relationship with the mother. The father testified that seeing the therapist had helped him recognize his mistakes. He understood he was responsible for the child's removal and that the child should always come first. He was willing to separate from the mother. The father acknowledged he had not gone to see the therapist since August.

The mother testified that she spent almost two months in the residential treatment program. While there, she participated in parenting education. She had attended NA/AA meetings but had never shown her attendance cards to the social worker. She admitted

10

she had never gone to therapy. She had not entered another drug treatment program because the costs were not covered. She was willing to separate from the father so that the child could be returned to the father.

The social worker explained that the Department had determined that separate visits were necessary because the father was very controlling during visits when the mother was present. The supervisor had not been able to assess the mother during those visits. When a representative from the Parents as Teachers program came to a visit, the father was uncooperative. He refused to take any instruction from the representative, who was afraid of him. However, since the conjoined visits had resumed, the social worker had not observed as much tension between the father and the mother.

The social worker continued to believe it was unsafe to place the child with the father and that there was no probability the child could be returned to him if services were extended to 18 months. Although the father had participated in the services and claimed he was willing to separate from the mother, the social worker did not believe he had changed or that he would in fact separate from the mother.

The juvenile court's findings echoed the social worker's testimony. The court first noted that the parents' failure to care for any of their other children was "the first clue as to what would happen" if M.I. was returned to them. The court found that the father had "domestic violence issues," that he had rejected therapy, that he continued to be enmeshed with the mother, and that he was "so untruthful with everybody trying to help him that it's hard to put much credence on anything he says." The court found that the father should have provided prescriptions for his pain medications, shown an understanding of the mother's drug problem, and separated from the mother previously. The court did not believe the father was telling the truth when he claimed he would separate from the mother. The court found that February 19, 2014 was the likely date by which the child could be placed for adoption or be subject to other permanency planning, and it set a section 366.26 hearing for April 15, 2014.

11

### K.     *Father's Writ Petition*

On December 19, 2013, the father filed a notice of intent to file a writ petition.  In his petition filed on January 15, 2014, the father contends further reunification services were in the child's best interest and that there was a substantial probability the child would be returned to him by the 18-month review.

## III.   DISCUSSION

Before evaluating the father's contentions, we will provide an overview of the applicable legal principles and the applicable standard of review.

### A.     *Legal Principles*

After a child is removed from a parent's custody, the juvenile court generally must order reunification services for the child and the parents.  (§ 361.5, subd. (a).)  When the child is under three years of age at the time of removal, reunification services are presumptively limited to six months.  (*Id*., subd. (a)(1)(B).)  Reunification services may be extended up to 18 months from the date of removal if the juvenile court finds a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within that extended time period or that reasonable services have not been provided to the parent or guardian.  (*Id.,* subd. (a)(3).)

At all status review hearings, the court must consider the safety of the child (§ 366, subd. (a)(1)), the Department's efforts (*id.*, subd. (a)(1)(B)), and the "extent of progress" that the parents have made "toward alleviating or mitigating the causes necessitating placement in foster care" (*id.*, subd. (a)(1)(E)).  At the 12-month review hearing, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f).)  "The failure of the parent or legal guardian to participate regularly

12

and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (*Ibid.*)

"The standard for showing detriment is 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less than capable than an available foster parent or other family member.' [Citation.]" (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400 (*Yvonne W.*).) "Rather, the risk of detriment must be *substantial,* such that returning a child to parental custody represents some danger to the child's physical or emotional well-being. [Citations.]" (*Ibid.*)

While a parent's compliance "with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court, . . . it is not determinative." (*In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 (*Dustin R.*).) In other words, parental compliance with the reunification plan does not automatically result in a child's return to parental custody. (*Ibid.*) Rather, the decision to return the child to parental custody depends on the court's assessment of the effect that return would have on the physical and emotional well-being of the child. (§ 366.21, subd. (f).) When the juvenile court considers whether to deprive a parent of custody, it is concerned about the parent's "grasp of the important parenting concepts—things such as a child's need for security, adequate nutrition and shelter, freedom from violence, proper sanitation, healthcare, and education." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 790 (*David B.*).) Thus, the court must consider whether the parent corrected the problem that required court intervention and the effect such return would have on the child. (*In re Joseph B.* (1996) 42 Cal.App.4th 890, 901.)

An appellate court reviews the juvenile court's finding that returning a child to the parent's custody would be detrimental under the substantial evidence test. (*V.C. v. Superior Court* (2010) 188 Cal.App.4th 521, 529.) In reviewing the record for substantial evidence, "we consider the evidence favorably to the prevailing party and

resolve all conflicts in support of the trial court's order. [Citation.]" (*Yvonne W., supra,* 165 Cal.App.4th at p. 1401.)

### B. Analysis

Having reviewed the entire record on appeal, we determine that substantial evidence supports the juvenile court's findings and orders. The evidence shows that the father received reunification services as to M.I. for 12 months after M.I. was born addicted to drugs, and after failing to reunify with his other daughter, who had become a dependent of the court two years earlier for the exact same reason. The father's service objectives included developing and demonstrating the ability to maintain a non-violent relationship and the ability to avoid abusive or threatening interactions. He was required to complete specific parenting education programs and regularly attend counseling.

While the father complied with the case plan to some extent, by participating in parenting and domestic violence programs, this is insufficient to compel reversal of the juvenile court's ruling. (*Dustin R., supra,* 54 Cal.App.4th at p. 1143.) His case plan progress was minimal. The father consistently demonstrated he had not yet developed the ability to maintain a non-violent relationship or the ability to avoid abusive or threatening interactions. He was overtly critical of M.I.'s caregiver, he constantly complained about the Department and was hostile towards staff, and he was domineering towards the mother. He did not complete one of the parenting programs because of his failure to cooperate. He remained with the mother, who continued to use drugs and failed to complete a rehabilitation program. Finally, although he had participated in therapy, he had not been focused on self-improvement but on the mother; moreover, he had missed the last three therapy appointments prior to the 12-month review hearing.

The facts here contrast with those in *Yvonne W., supra,* 165 Cal.App.4th 1394, where "[t]he uncontroverted evidence" showed that the mother had "*completed* her case plan." (*Id.* at p. 1401, italics added.) In that case, the child had been removed due to the mother's drug use, and the mother had engaged in extensive reunification services within

the first six months after the removal.  (*Id.* at p. 1397.)  The mother was "committed to her sobriety," appeared to have benefitted from the reunification services, and had made changes that were "in her children's best interests."  (*Id.* at p. 1401.)  She was safely parenting another child.  She had done "everything Agency asked of her, including eliminating the conditions that led to Yvonne's out-of-home placement."  (*Ibid.*)  Thus, substantial evidence did not support a finding of detriment under section 366.22.  (*Id.* at pp. 1400-1402.)

In this case, the juvenile court could reasonably determine that, while the father had made some progress during the reunification period, he was not yet ready to care for his young child.  In particular, the evidence supported a finding that the father failed to "grasp" certain "important parenting concepts," including the child's need for freedom from violence and her need for protection from the mother's potential substance abuse relapses.  (*David B., supra,* 123 Cal.App.4th at p. 790.)  The juvenile court also found that the father lacked credibility, particularly regarding his claim that he was willing to separate from the mother.  Importantly, the social worker did not believe there was any probability the child could be returned to the father if services were extended to 18 months.  As the father had failed to reunify with his other daughter and had failed to make substantive progress in his case plan during the 12 months that he had been provided reunification services as to M.I., substantial evidence supports the juvenile court's findings that there would be a substantial risk of detriment to the safety and well-being of the child if she were returned to the father.  (§ 366.21, subd. (f).)  We will therefore deny the father's writ petition.

## IV.  DISPOSITION

The petition for extraordinary writ is denied.

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.